1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3                        PORTLAND DIVISION

4
GREAT NORTHERN RESOURCES,        )
5    INC., DYNAMIC SERVICE FIRE AND   )
SECURITY, LLC, and WALTER        )
6    VAN LEJA, on behalf of          ) Case No. 3:20-cv-01866-IM
themselves and others            ) (Lead Case)
7    similarly situated,             )
                                 ) Case No. 3:20-cv-02022-IM
8                    Plaintiffs,  ) (Trailing Case)
                                 )
9                    v.          )
                                 ) January 5, 2021
10   KATY COBA, in her Official     )
Capacity as State Chief         )
11   Operating Officer and Director )
of the OREGON DEPARTMENT OF     )
12   ADMINISTRATIVE SERVICES;       )
OREGON DEPARTMENT OF            )
13   ADMINISTRATIVE SERVICES; THE   )
CONTINGENT; BLACK UNITED FUND   )
14   OF OREGON, and DOES 1-10,      )
                                 )
15                   Defendants.  )
_____)
16

17

18

19                     TELEPHONIC HEARING

20         TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

21        BEFORE THE HONORABLE KARIN J. IMMERGUT

22           UNITED STATES DISTRICT COURT JUDGE

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF OREGON

3                            PORTLAND DIVISION

4
    COCINA CULTURA, LLC., an            )
5   Oregon limited liability           )
    company,                           )
6                                      )
                           Plaintiff,  )  Case No. 3:20-cv-02022-IM
7                                      )
                      v.               )
8                                      )  January 5, 2021
    STATE OF OREGON; OREGON            )
9   DEPARTMENT OF ADMINISTRATIVE       )
    SERVICES; KATY COBA, in her        )
10  Official Capacity as State         )
    Chief Operating Officer and        )
11  Director of the Oregon             )
    Department of Administrative       )
12  Services; THE CONTINGENT, an       )
    Oregon nonprofit corporation;      )
13  THE BLACK UNITED FUND OF           )
    OREGON, INC., an Oregon            )
14  nonprofit corporation,             )
                                       )
15                         Defendants. )
    _____)
16

17

18

19                        TELEPHONIC HEARING

20                     TRANSCRIPT OF PROCEEDINGS

21           BEFORE THE HONORABLE KARIN J. IMMERGUT

22             UNITED STATES DISTRICT COURT JUDGE

23

24

25

```
1                        TELEPHONIC APPEARANCES

2

3   FOR THE PLAINTIFF(S):
                              JONATHAN F. MITCHELL
4                             Mitchell Law PLLC
                              111 Congress Avenue
5                             Suite 400
                              Austin, TX 78701
6
    FOR THE PLAINTIFF(S):
7                             BRADLEY A. BENBROOK
                              Benbrook Law Group, PC
8                             400 Capitol Mall
                              Suite 2530
9                             Sacramento, CA 95814

10  FOR THE PLAINTIFF(S):
                              STEPHEN M. DUVERNAY
11                            Benbrook Law Group, PC
                              400 Capitol Mall
12                            Suite 2530
                              Sacramento, CA 95814
13
    FOR THE PLAINTIFF(S):  JAMES L. BUCHAL
14                            Murphy & Buchal, LLP
                              3425 S.E. Yamhill Street
15                            Suite 100
                              Portland, OR 97214
16

17  FOR PLAINTIFF COCINA CULTURA, LLC:

18                            MICHELLE ANN SCOTT
                              Center for Individual Rights
19                            1100 Connecticut Avenue NW
                              Suite 625
20                            Washington, DC 20036

21
    FOR PLAINTIFF COCINA CULTURA, LLC:
22
                              SHAWN M. LINDSAY
23                            Harris Berne Christensen LLP
                              15350 SW Sequoia Parkway
24                            Suite 250
                              Portland, OR 97224
25
```

```
 1                    TELEPHONIC APPEARANCES

 2                         (Continuing)

 3   FOR THE DEFENDANT(S):
                            CLIFFORD S. DAVIDSON
 4                          Snell & Wilmer LLP
                            One Centerpointe Drive
 5                          Suite 170
                            Lake Oswego, OR 97035
 6
     FOR THE DEFENDANT(S): SHEILA H. POTTER
 7                          Oregon Department of Justice
                            100 SW Market Street
 8                          Portland, OR  97201

 9   FOR THE DEFENDANT(S):
                            AMANDA T. GAMBLIN
10                          Schwabe Williamson & Wyatt
                            1211 SW 5th Avenue
11                          Suite 1900
                            Portland, OR 97204
12
     FOR THE DEFENDANT(S):
13                          NICHOLAS F. ALDRICH , JR.
                            Schwabe Williamson & Wyatt
14                          1211 SW 5th Avenue
                            Suite 1900
15                          Portland, OR 97204

16   FOR THE DEFENDANT(S:)
                            KELLY H. DOVE
17                          Snell & Wilmer LLP
                            3883 Howard Hughes Parkway
18                          Suite 1100
                            Las Vegas, NV 89169
19

20   FOR DEFENDANT BLACK UNITED FUND:

21                          LINDSEY HARRIS HUGHES
                            Keating Jones Hughes, P.C.
22                          200 SW Market Street
                            Suite 900
23                          Portland, OR 97201

24

25
```

```
 1                    TELEPHONIC APPEARANCES

 2                         (Continuing)

 3   FOR DEFENDANT BLACK UNITED FUND:

 4                         HILLARY A. TAYLOR
                          Keating Jones Hughes, P.C.
 5                        200 SW Market Street
                          Suite 900
 6                        Portland, OR 97201

 7

 8   COURT REPORTER:     Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                          United States District Courthouse
 9                        1000 SW Third Avenue, Room 301
                          Portland, OR 97204
10                        (503)326-8191

11                          *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TRANSCRIPT OF PROCEEDINGS

2                        (January 5, 2021)

3   (Telephonic hearing:)

4                THE COURT:  Hello.  This is Judge Immergut.

5        Jake, are we ready to go, and can you hear me okay?

6                DEPUTY COURTROOM CLERK:  Judge, we're all set, and I

7   can hear you loud and clear.

8                THE COURT:  All right.  Perfect.  Thank you.

9        We're here on the record in the consolidated cases of

10  Great Northern Resources, Inc. v. Coba, et al. and

11  Cocina Cultura LLC v. State of Oregon, et al.  The respective

12  case numbers are 20-cv-01866 in the Great Northern case and

13  20-cv-02022 in the Cocina Cultura case.

14       This was the time set for a hearing on the limited issue

15  of whether those who failed to submit grant applications before

16  the fund closed have any claim for relief.  That was requested

17  by defendants.

18       Let me go through the roster of who is on this call, and

19  if you could also tell me who will be counsel speaking on

20  behalf of your side, that would be helpful.  So, first, for

21  plaintiff, we have Bradley Benbrook.

22                MR. BENBROOK:  Yes, I'm here, Your Honor.

23       Jonathan Mitchell is also here, and he will be arguing for

24  us.

25                THE COURT:  Okay.  Thank you.

1        And James Buchal?

2              MR. BUCHAL:  Here, Your Honor.

3              THE COURT:  All right.  Thank you.

4        And Steven Duvernay?

5              MR. DUVERNAY:  Here, Your Honor.

6              THE COURT:  And Jonathan Mitchell?

7              MR. MITCHELL:  Here, Your Honor.

8              THE COURT:  And for Plaintiff Cocina we have Michelle

9   Scott?

10             MS. SCOTT:  I'm here, Your Honor.

11             THE COURT:  And Shawn Lindsay.

12             MR. LINDSAY:  Yes, I'm here, as well, Your Honor.

13             THE COURT:  Ms. Scott, I wasn't quite -- I know

14  Cocina is a little bit along for the ride on this.  Did you

15  want to make any argument?  I did see your brief.  Did you want

16  to make any argument today?

17             MS. SCOTT:  We would rest on the brief, unless you

18  have, you know, a question about something in the brief that

19  you needed to clarify, we would be happy to do that, but

20  otherwise no.

21             THE COURT:  Perfect.  I'll ask you at the end, also,

22  if you have anything additional to say.  And somehow if I

23  forget to do that, please get my attention if you do have

24  something you do want to add.  And I think that covers

25  everybody for plaintiff.

 1     And then for defendants, do we have Clifford Davidson for

 2  the State?

 3           MR. DAVIDSON:  I'm here, Your Honor.  Ms. Dove is on

 4  the line, and she will be arguing with respect to the briefing.

 5           THE COURT:  Okay.  Thank you.

 6     And is Sheila Potter also on the line, and will she be

 7  arguing at all?

 8           MS. POTTER:  I am, Your Honor; and, no, I will not.

 9           THE COURT:  Okay.

10     For then for The Contingent, we have Amanda Gamblin?

11           MS. GAMBLIN:  Yes.  And I will be arguing on behalf

12  of The Contingent.

13           THE COURT:  And Nika Aldrich?

14           MR. ALDRICH:  Yes.  I may contribute to ancillary

15  issues, but Ms. Gamblin will take the majority of the argument.

16           THE COURT:  I will try to remember -- do you have a

17  way of getting Ms. Gamblin's attention?  I'll ask -- I'll try

18  to remember to ask.  It's a little more challenging because I

19  can't see you waving at me on video, so I -- but if I forget,

20  then, please let me know.

21     And then for The Black United defendants, we have

22  Lindsey Hughes.

23           MS. HUGHES:  Yes, Your Honor.  We'll be relying on

24  the other defendants' arguments.  To the extent anything needs

25  to be culled out for Black United Fund at the end, I'll do so

1    in response to your questions.

2              THE COURT:  Perfect.  Thank you.

3         And Hillary Taylor.

4              MS. TAYLOR:  Yes.  Good afternoon, Your Honor.

5              THE COURT:  Thank you.  I believe that covers all

6    counsel.

7         I did want to remind everyone who's on the phone that just

8    like in open court, these proceedings may not be recorded.

9    Jill Jessup, my court reporter, is also on the line, preparing

10   a transcript of everything that is said, and if anybody needed

11   that, they can order it through Ms. Jessup; but it's absolutely

12   prohibited to be recording any aspect of this proceeding, and

13   certainly I will not hesitate to hold anyone in contempt who

14   violates my order.

15        With that, the way I would like to start is I do have some

16   questions to pose to each side, and then I will allow you to

17   argue for a limited time about anything in addition you would

18   like for purposes of this limited issue.

19        And thank you for all the briefing on the issue.  As you

20   will recall, this was a hearing really set for the limited

21   purpose of determining whether those who failed to submit grant

22   applications before the fund closed could have any claim for

23   relief at all.  And the goal, as I understood it from

24   defendants' perspective, was to determine whether -- if the

25   answer to that is "no," then I believe defendant thought or --

1    or my understanding was that then there was some agreement that

2    a substantial portion of the funds that were outside of the

3    scope of anyone who had applied could be returned to The

4    Contingent or the State defendants for distribution to those in

5    the queue, and that is those ready to be approved.

6         From reading your briefing, that certainly seems not to be

7    the case -- that there is any sort of agreement about what the

8    next steps are.  So I wanted to -- in reviewing the pleadings

9    for purposes of this legal issue as well as the prior

10   pleadings, it seems to me that plaintiffs have taken some

11   different viewpoints on exactly what the remedy is that they

12   are seeking in this case, and I wanted to try to clarify that

13   with you, Mr. Mitchell, if I could.

14        And it seems to me that you have said at some points that

15   you are not looking to unravel what has already been done and

16   what you would be seeking going forward is a race-neutral

17   application of the fund criteria.

18        Now that we know that there are 7,000-plus people in the

19   queue already and including 60-plus non-black applicants, tell

20   me exactly what relief looks like and also with a particular --

21   it would be helpful to mention, sort of, Mr. Leja and Dynamic

22   Service in that process too.  What it is now that you would

23   want for all of the plaintiffs, and what is really the remedy

24   here in terms of both money and/or injunctive relief?

25             MR. MITCHELL:  Yes, Your Honor.  So there's both

1    prospective relief that we're seeking and also retrospective

2    relief.  I'll begin with prospective relief going forward.  The

3    plaintiffs' position is that for the remaining $8 million, it

4    cannot be distributed according to either an explicitly racial

5    process or according to a process that has been tainted in any

6    way by the racial exclusion that was being enforced until the

7    time that we sued.

8        So in the plaintiffs' view, first-come, first-served, with

9    respect to the individuals already in the queue, is not a

10   permissible method of distributing that remaining money because

11   at the time those individuals were applying, the fund was only

12   open to members of a particular race, which deterred and

13   prevented others from applying because it was futile to do so.

14       So we believe the Court's remedy should enjoin the

15   defendants from distributing this remaining money according to

16   either explicitly racial criteria, which is what they had

17   currently been doing when we sued, or according to the

18   first-come, first-served process because that process has been

19   tainted by the previous racial exclusion.

20           THE COURT:  So let me ask you with the first-come,

21   first-served, so you have -- I don't know the exact number

22   offhand, but 7,000 have already applied, and you have, even at

23   this point, a shortfall.  Not even all of those 7,000 can get

24   the money because it's a shortfall of -- my memory is around

25   800,000.  Too many people have applied -- or more people have

1   applied than there is money to give out.  If it's not done, are

2   you asking the Court to then say, "The Contingent and The Black

3   Fund, you can now mush everyone together, regardless of when

4   they applied, and then apply race-neutral criteria"?

5           MR. MITCHELL:  We don't think the Court has to

6   dictate the particular process by which that remaining money is

7   distributed.  There are, at least in the plaintiffs' view,

8   multiple ways that would be constitutionally and legally

9   permissible for the defendants to distribute that fund, and we

10  don't think the Court has to tell them a particular way that

11  they have to do it, but we do think the Court has to find --

12          THE COURT:  Give me -- what's an example?

13          MR. MITCHELL:  They could do it by lottery.  They

14  could just say we will throw open the doors to members of all

15  races.  We will let everyone apply for a certain window of

16  time, including the people who are already in the queue, and we

17  will just use a lottery system to allocate the money.  That's

18  one permissible way to do it.

19      Another permissible way to do it is to acknowledge, yes,

20  we are oversubscribed.  We are oversubscribed already because

21  of all these people who are in the queue, but we will open it

22  up for a window of time to members of all races and allow those

23  people to reply, but we'll have everybody take a haircut.  So

24  instead of giving a hundred percent of what we would normally

25  give, if we were doing it before the plaintiffs sued, we will

1   just have everyone get 50 percent if -- if we have twice as

2   many applicants as what we have money for.  That could be

3   another way to do.  We don't think the Constitution or the

4   federal statutes dictate a choice between those two methods or

5   any other method that's a mixture of those two.  So we don't

6   really think it is the Court's role, in this case, to decide on

7   the actual method or choose one of other legally permissible

8   methods that could be used to distribute the remaining funds.

9   We think the Court's job here is only to establish the

10  boundaries defined by the law.

11          THE COURT:  Let me ask you.  There was a suggestion

12  in the briefing from the defendants that the CARES Act

13  authorization would not allow a distribution of the -- or a

14  redefining of how the fund is going to be run.  Do you have a

15  position on that?  And if defendant is right, doesn't --

16  would -- wouldn't that suggest that prospective relief is moot?

17          MR. MITCHELL:  I don't believe the CARES Act can

18  override the commands of the Equal Protection Clause.  So if

19  the Court agrees with the plaintiffs' position that a

20  race-based distribution is unconstitutional, that would have to

21  trump anything that appears in the CARES Act.  And then with

22  respect to Title VI and the federal statutes on the --

23          THE COURT REPORTER:  Mr. Mitchell, you are a little

24  muffled for me.

25          MR. MITCHELL:  I'm sorry.  Let me take it off

1    speakerphone.

2        Is that any better?

3            THE COURT REPORTER:  Yes, it is.

4            MR. MITCHELL:  Your Honor, I believe your question

5    was whether there are provisions in the CARES Act that would

6    prevent the defendants from changing the approach that they

7    were using to distribute money in response to our lawsuit, and

8    the answer to Your Honor's question is, first, if the Court

9    agrees with us that the Equal Protection Clause prohibits the

10   defendants from using racially based criteria, that command in

11   the Constitution has to trump anything that is in the CARES

12   Act.

13       And then if the Court agrees with us on the issues of

14   Title VI and Section 1981, federal statues that impose

15   antidiscrimination norms, the defendants would have to show

16   that the CARES Act effectuates an implied repeal or a partial

17   implied repeal of those previous statutory enactments that

18   would allow them to use race-based criteria, again, if and only

19   if the Court agrees with us that this racially exclusionary

20   standard violates Title VI or Section 1981.  And it's a very,

21   very tall order to show an implied repeal with respect to two

22   federal statutes.

23       So, again, if the Court disagrees with us on the Equal

24   Protection Clause and Title VI and Section 1981, then there's

25   really no remedy the Court can give us; but if the Court agrees

1   with our claims on the merits, we don't think there's anything

2   in the CARES Act that should prevent this Court from awarding

3   the relief that we seek because we're basing our arguments in

4   the Constitution, which trump everything, or basing it on

5   earlier federal statutes, and they haven't made any argument

6   that there's been an implied repeal.

7          THE COURT:  And is it fair to say that the --

8   assuming just for the sake of argument that I agree with

9   plaintiffs about the constitutionality of the race-based

10  criteria, then is there any way to get the remedy with --

11  without reshuffling the first-come, first-served?  So you

12  are -- is it fair to say that your remedy has to include

13  eliminating first-come, first-served and all the people who

14  have been waiting and are, say, number one or two in the line,

15  they could be shuffled to the end of the line?

16          MR. MITCHELL:  We believe that's right, Your Honor.

17  We believe that's right.  Because the first-come, first-served

18  system is irredeemably tainted by this racial exclusion that

19  they were enforcing at the time those individuals applied.

20  These people applied for funds at a time when the fund was

21  closed to members of any race that wasn't black, and they got

22  their place in line because of a racial exclusion that, in the

23  plaintiffs' view, is illegal and unconstitutional.

24       So if the Court agrees with us that the racial exclusion

25  is illegal and unconstitutional, we don't think it's possible,

1    legally, for the defendants to distribute the remaining funds

2    according to first-come, first-served.

3        And, again, this is premised on the assumption that the

4    racial exclusion was a violation of the Equal Protection Clause

5    and a violation of Title VI or Section 1981.

6            THE COURT:  And does the fact that you have 60-plus

7    non-black applicants affect the analysis at all in terms of

8    how -- what you're asking for in terms of relief?

9            MR. MITCHELL:  We think the presence of 60 non-black

10   applicants just highlights and strengthens our position that

11   first-come, first-served is a tainted and impermissible process

12   because it shows that of the thousands of people in the queue

13   only 60 of them are non-black because everyone else who didn't

14   apply realized it would be a waste of time and a futile effort

15   to do so.  And perhaps those 60 individuals were unaware of the

16   racial exclusion.  Perhaps they applied in the hope they might

17   be able to sue later and get some remedy.  But the facts that

18   we have already, with respect to the racial makeup of this

19   applicant pool, just shows the far-reaching effects of the

20   racial exclusion because nobody applied, except for these 60

21   individuals, who wasn't black.  And that racial exclusion has

22   produced an applicant pool that is drastically skewed on racial

23   criteria.  And because of that, we don't think that process can

24   be used to distribute the remaining funds.

25            THE COURT:  Okay.  Let me turn to defendants for a

 1   minute and then because -- well, actually, let me do this:
 2   I'll ask defendants my question, and then, Mr. Mitchell, I
 3   probably will then let you argue anything you would like first,
 4   even though -- because this process is really an unusual one, I
 5   suppose.  It's really competing briefs about an issue, so it's
 6   nobody's motion, specifically, but does that make sense for you
 7   to argue first?
 8           MR. MITCHELL:  I have no objections to arguing first,
 9   Your Honor.
10           THE COURT:  Let me turn to defendants for a minute
11   and let me ask, first, probably Mr. Davidson my question.  It's
12   sort of the same question about the -- what is allowed after
13   January 1, 2021, in terms of the remedy?  So what plaintiffs
14   now have clarified, they are -- essentially take away the race
15   neutral or the race-based criteria or race-conscious criteria
16   and just throw out first-come, first-served, which seems, to
17   me, to put all 7,000 people in a barrel and then possibly open
18   up new applications, or not, but at least reshuffle and get rid
19   of the first-come, first-served.  Is it -- I understood, from
20   defendants' briefing, that that might not even be allowed under
21   the CARES Act.
22       Tell me a little bit about your position on that and what
23   we -- does anybody -- I didn't see a focus of the briefing on
24   this, but I understood that you're making the argument or
25   defendants make the argument that that then moots the

1  prospective relief.

2          MS. DOVE:  Your Honor, this is Kelly Dove, and I'll

3  take the first crack, but Mr. Davidson can come behind me if he

4  wants to add anything.  We did include a brief discussion of

5  this in our initial briefs because it did relate to mootness,

6  but I think one of the things it gets away from a little bit

7  here is really the role of the non-applicants.  And it would be

8  our position that reopening the fund or reopening the program

9  would not be allowed, and this is -- this is also part of

10  taking it away from the CARES Act a little bit, which walls the

11  source of the funding.  This is a creature of, you know, state

12  law that was -- was developed and created several months ago

13  and had a finite period of time, with an expiration date of

14  December 30th, and a closure of the applications period

15  slightly before that.

16      So it would be our position that reopening this to unnamed

17  non-applicants who never applied and might not have been aware

18  of the program during the open period would not be a

19  permissible course of action here or to cure mootness by simply

20  reopening the program, which would really swallow mootness if

21  it was judicially a program that was set to expire by its own

22  terms or was amended with just revived -- you know, revived by

23  the Court in order for people to continue to apply or rewrite.

24      And so our brief discussion in our brief was meant to

25  convey -- we didn't think that the program could be rewritten

1   to redistribute the fund.  Now that doesn't mean there's

2   absolutely no relief for existing applicants.  Because if the

3   Court were to find that the program is constitutionally infirm,

4   it could enjoin the whole program.  But I think there's a

5   difference there between enjoining the program as a whole and

6   saying it's constitutionally infirmed and you may not

7   distribute funds according to this race-conscious basis and

8   then, on the other hand, reconfiguring the program entirely to

9   shuffle who's in line, where they are in line, what criteria

10  should -- should replace the current criteria to distribute the

11  funds, and go from there.

12       But for the purposes of today's briefing, it was our

13  strong position that non-applicants who have not applied by the

14  closure of the application deadline and the dated expiration

15  date of the fund, in any event, should not have any -- the

16  causes of action for prospective relief are closed as to those

17  non-applicant individuals.

18          THE COURT:  So let me ask you about that.  That's

19  Mr. Leja and Dynamic who are in that position.  If I were,

20  assuming for the sake of argument, to agree that you had to be

21  an applicant, then aren't -- isn't that effectively a dismissal

22  of their claims and the class that they represent without

23  filing a motion to dismiss?

24          MS. DOVE:  Yes.  I think it does effect a dismissal

25  of their claims because -- and not just on the one point, but

1   because you -- under the prospective relief standard, which is

2   the "able and ready" standard, that standard only applies

3   insofar as the program is ongoing.  And then once a program is

4   no longer ongoing and all that is remaining is a damages

5   action, we discuss the standard we believe applies, which is

6   that you would be able to get this benefit if you were not

7   subject to the race-conscious criteria.

8        So in this kind of situation, which is probably somewhat

9   unusual but not unprecedented, where this program here is

10  finite and not ongoing, with the stated expiration date as of

11  the -- the time of this inception, they either needed to apply

12  to sort of get their place in line, so to speak, and a lot of

13  these cases, whether they're employment cases or big cases,

14  speak of your place in line and how far down the list you were,

15  whether you're a job applicant or a fund applicant, and our

16  position is that non-applicants never got their place in line.

17  And as such, now that they're time-barred from applying, we

18  cannot go back and undo that.  So we do think the result of

19  that is dismissal under the standing and mootness jurisprudence

20  that applies here.

21          THE COURT:  So is this the -- I find, in a sense, I'm

22  being asked to offer an advisory opinion that hadn't been teed

23  up in the appropriate type of motion.  I mean, is this a

24  premature analysis of an issue that really should be teed up

25  either at summary judgment or, before that, even at a motion to

1  dismiss?

2        MS. DOVE:  Well, Your Honor, we think there's been

3  some discussion in the briefing about evidence and, in some

4  cases, where, for instance, there's a showing that an applicant

5  could not have gotten a particular position regardless of the

6  race-neutral criteria, and the like, but here, with the

7  non-applicant situation, especially -- and even if you look

8  under *Carney* or *Carroll v. Nakatani* or *Braunstein*, you know,

9  Mr. Leja's declarations are really not materially different

10  from theirs.  And we could do this as a motion, but I think, as

11  we were discussing standing, which is a threshold issue, even

12  if not raised in a motion to dismiss, we think non-applicants

13  cannot -- cannot demonstrate standing, and the effect of that

14  is that they're -- they cannot sustain their case, but I don't

15  think --

16        THE COURT:  Although --

17        MS. DOVE:  Oh, I'm sorry, Your Honor.  Go ahead.

18        THE COURT:  But although the cases it seems you rely

19  on for the issue of standing or the relevant discussion --

20  decisions on standing and ready and able to apply and evidence

21  of intention to apply, aren't those decided at summary judgment

22  when there's been at least some development of the facts?

23        MS. DOVE:  Most of them have been, Your Honor, but I

24  think -- you know, and it's possible that plaintiffs' counsel

25  might -- could ask to amend and come forward to give more

1    evidence about what Mr. Leja might have done to be ready and

2    able to apply.  However, the "able and ready to apply"

3    standard, in our position, is now closed, and that standard no

4    longer applies because the program has expired and they have,

5    in fact, not yet applied.  And so then the only alternative to

6    relief would be the damages relief, but because they have not

7    applied, they are time-barred from applying, which is a

8    race-neutral basis for their exclusion from the benefit.  And

9    because they never took a place in line, they cannot possibly

10   show that they would have been entitled to this benefit if it

11   were not for the race-conscious criteria.

12        And then I think -- and I certainly won't put words into

13   Mr. Mitchell's mouth, but I think Your Honor's initial question

14   brought some light to, well, what is the relief?  Because it

15   seems to be going in a circle as that plaintiff or

16   non-applicants might have standing if the Court were to reopen

17   the program and allow them to apply or reconfigure the program

18   in a way that they might be able to participate differently or

19   they might choose to participate differently, but that is not

20   how it works when a program has expired or been amended, even

21   if, frankly, it's in reaction to a lawsuit, which this wasn't,

22   because the expiration date was set at its inception.

23             THE COURT:  Although, let me ask you, Ms. Dove.  The

24   lawsuit was actually, I think, the day before you shut down the

25   fund.  They applied on the Sunday night, if I remember

correctly, and I think the fund was shut down, actually, even
Tuesday.  But it was right at the same time or right before.  I
think you mentioned that they might be entitled to damages if
they could show ready and able, but isn't that what we're
talking about here?  If anybody is entitled -- for the limited
purpose of this hearing, if any of the plaintiffs and class of
plaintiffs could be entitled to damages even though they didn't
actually apply, don't they get at least a chance to try to
present evidence of standing, as opposed to me deciding at this
early stage?

          MS. DOVE:  Well, our position is that they -- they
could -- the "able and ready" is only sufficient to -- to
sustain prospective or injunctive relief.  So once -- you know,
the "able and ready" standard only applies when there's an
ongoing program.  Like every year the University of Michigan
applies -- you know, admits a new class of students.  You know,
bid programs are ongoing for a period of years.  The "able and
ready" standard says you don't have to actually apply for a
program that you might be excluded from by -- for purposes of
race-conscious criteria.  You need only show that you're able
and ready.  But that standard no longer applies once a program
ends.

     And so once a program ends, we -- the only -- the only
relief that is left is damages or retrospective relief, which,
under *Texas v. Lesage*, *Donahue* from the First Circuit, and

1    *Braunstein* from the Ninth Circuit, say you have to show that

2    you would have gotten the benefit if it weren't for the

3    race-conscious criteria.   And for a very bright line for case

4    purposes, we think is that non-applicants cannot possibly

5    satisfy that regardless of other factual circumstances because

6    the time for applying has expired.   So there's just no place or

7    no manner in which they could establish that they would have

8    gotten that benefit without the race-conscious criteria because

9    their failure to apply and their failure to ever get in the

10   line for the benefit forecloses their ability to show that they

11   could -- that they could have ever qualified.   Whereas, in

12   contrast, Cocina and Great Northern, who have actually applied,

13   they may be able to make that showing, and it is more of a

14   factual inquiry for those two parties who might have questions

15   about where they are in line, whether they would have otherwise

16   qualified for the relief, and so on.

17           THE COURT:   And the fact -- so what about

18   Mr. Mitchell's argument that -- that it would have been --

19   Mr. Leja didn't apply because he felt it was futile to apply,

20   and presumably there might be some other people out there who

21   would say the same thing, and they would have been eligible to

22   apply but didn't.   Are you saying there just would be no relief

23   from a race-based unconstitutional criteria for people like

24   that who were chilled from applying?

25           MS. DOVE:   Yes.   And here is why:   Because that puts

them into generalized grievance territory, and in order to
bring a claim and have standing, they need to distinguish
themselves from -- as *Carney* put it, suffering the same
purported injury as all other citizens of the state.

And so while a program is ongoing, the law acknowledges
you do not need to futilely apply to a program that you don't --
you don't facially qualify for or you might be facially
excluded by some criteria; but in order to maintain your
standing, if a program is ending, you need to -- you need to
apply.  You need to get your place in line to -- to maintain
your standing; otherwise, you are in a generalized grievance
territory where anybody who might have been dissuaded from
applying -- and here Mr. Leja and Dynamic perhaps made a
strategic choice not to apply because they were dissuaded based
on the race-conscious criteria, but what happens in these
lawsuits all the time is somebody applies for a program or
challenges a program that they believe they won't be accepted
to for various reasons that they argue is -- are impermissible,
and here, to stake out their standing and to make clear that
they are crossing a generalized grievance threshold, knowing
that the program was closing -- that was no secret -- knowing
that the program was closing and expiring, they, under this
framework, should have -- should have filed an application even
if the program were going on for two more years.  They could
have rested on their "able and ready" status and gone from

1    there.

2          THE COURT:  But let me -- let me ask you.  It seemed

3    to me, from the briefing, that one of the arguments plaintiff

4    is making is if I were to agree that only non-applicants -- or

5    only applicants -- people who actually applied could get

6    damages in the case, were entitled to relief, then -- and there

7    were a new distribution of this 8 million that is currently in

8    the Court Registry, that would provide a basis for new

9    injunctive relief, if I understood correctly.

10        And, Mr. Mitchell, correct me if I'm wrong, after I give

11    Ms. Dove a chance to answer the question, what about that?

12    Don't they get some renewed possibility of prospective

13    injunctive relief if the fund, then, gets to operate again and

14    dole out the 8 million?

15          MS. DOVE:  And just to be clear about your question,

16    Your Honor, are you talking about where the universe is -- is

17    current applicants or people who have already -- and businesses

18    who have already applied?

19          THE COURT:  Correct.  So if I rule in -- if I decide

20    in your favor, assuming that, for the sake of argument, then,

21    if I understood correctly, plaintiffs are saying, well, then

22    it's -- there's an ongoing application process and that that

23    could be enjoined and with new violations.

24          MS. DOVE:  New -- okay.  I'm -- yeah.  I'm not sure

25    if I -- if I'm conceiving exactly what -- what that would look

1    like, but I think if you were to conclude that non-applicants

2    cannot sustain a claim for relief, and we would be going

3    forward with applicants only, I think, while we -- we didn't

4    fulsomely go through that for today, I think it would look like

5    all of the universe of current applicants who are vying for the

6    remaining funds.  We would have to -- I think it would really

7    necessitate and invite further briefing on what the nature of

8    the relief might look like there, but I think if -- the

9    conclusions that non-applicants don't have standing, that would

10   close that universe and -- and allow the parties to

11   meaningfully brief what could -- what form of injunctive relief

12   could arise from that; although, I don't think, as I mentioned

13   before, that -- that any possibility would be that it's

14   reopened outside of that closed group of people who have

15   already applied.

16        And it is possible that one answer to that is there -- you

17   know, there might not be -- there might not be a wide range of

18   remedial options there, especially if, from Mr. Mitchell's

19   perspective, there's no way to -- there's no way to limit

20   equitably the distribution funds to current applicants, and

21   I -- I don't have any more to say about that, unless The

22   Contingent's counsel or anyone -- or Mr. Davidson has something

23   to add to that.

24        THE COURT:  Why don't I ask The Contingent.

25        Ms. Gamblin, do you have any statement about that

1   particular issue?  I did want to also get back to Mr. Mitchell,

2   and you will get to argue -- everyone will get to argue their

3   piece on anything additional.

4           MS. GAMBLIN:  Okay.  Yeah.  If we were on video, you

5   would see me squirming in my seat.  It's been a long half hour.

6   I have a lot to say, but I'll try to keep it limited to just

7   this particular point right now.  But as far as whether any

8   money is released and then distributed based on race, those

9   applications are already processed.  That was already done.

10  The plaintiffs had three chances to enjoin that process, and

11  they couldn't meet the criteria for a preliminary injunction.

12  That process of those -- processing those applications based on

13  race was not enjoined, and so that happened.  It's in the past.

14  It's done.  There's no claim to that money from anybody else,

15  we're arguing here, particularly non-applicants.  So that time

16  has passed.

17          THE COURT:  Let me ask you about that.  So when you

18  say, Ms. Gamblin, that you've processed the applications.  I

19  know you have many applications in queue.  Does that mean that

20  they have already been evaluated in some way and determined

21  that they would get paid and the order, or am I -- what does

22  "processing" mean?  Because I think plaintiffs have said

23  they're not asking for a reprocessing of anybody who's already

24  been awarded or about to award the grant money.

25          MS. GAMBLIN:  Yeah.  Yeah.  And what The Contingent

1    had agreed to do is they said it was going to continue to

2    process applications, unless it was enjoined to stop, and it

3    would take them all the way through the process, all the way to

4    the point of being approved by the Council's trust.   The

5    Contingent would not send notifications to people saying,

6    "Expect your award."

7         So none of those notifications have been sent, but the --

8    but the awards have been decided and approved.   So --

9              THE COURT:  For how much?  For all 8 million?

10              MS. GAMBLIN:  Well, now you're perhaps getting into

11    some niggling details that are hard to parse, and I hate to be

12    the one testifying, but from what I understand, The Contingent

13    processed as many applications as it could through

14    December 30th and made it through all but about 2 million of

15    the 8.8 million.

16              THE COURT:  Okay.

17              MS. GAMBLIN:  The State and The Contingent are --

18    outside of the litigation, are -- are talking about whether

19    The Contingent can process enough of those remaining

20    applications in the queue to get through the whole 8.8 million

21    and if they can do that beyond December 30th, and I don't think

22    the parties have come to agreement on that.

23              THE COURT:  And let me ask you just -- and I don't

24    know if you would know this answer and I'm not quite sure that

25    it's very relevant, but the 60-plus applicants who are

1   non-black applicants, do we know where they are in the queue?

2            MS. GAMBLIN:  So just to correct a fact, Mr. Sand's

3   declaration said that there were hundreds of individuals who

4   did not self-identify as black who had applied, and there were

5   65-ish black-owned businesses.  So there are hundreds.

6   Mr. Sand's declaration said hundreds of people who have applied

7   who are not black.  Since then, I have learned it's close to

8   800.  So it's a lot of people who were not -- who are -- did

9   not identify as black who applied anyway.  But the 800 number

10  is not before you.

11           THE COURT:  Yeah, I understand.  I appreciate your

12  correcting.  Now I remember that better.

13       But are those -- in terms of processing, have those been

14  processed?

15           MS. GAMBLIN:  So no.  Yeah.  So, no, not fully.  I

16  think none of those people have been told one way or the other.

17  I think that as applications were being processed, if they got

18  closed for one reason or another, one of them might have been

19  raised where they didn't have an Oregon license or whatever

20  reason they got put in a closed status.  None of the people in

21  the closed status have received any information about their

22  application being closed.

23       Hundreds of those are people who did not self-identify as

24  black.  And so they haven't, I guess, formally been processed

25  all the way through.  They would need -- they got processed up

1    to the point where they were closed for one reason or another,

2    and they would have to be reprocessed, I guess, is the way to

3    say it.

4              THE COURT:  Okay.  So I think I interrupted you.  You

5    were trying to make another point.

6              MS. GAMBLIN:  Yeah, I would like to make this point

7    quickly, because I think it's an important one for

8    understanding what at least The Contingent intended to request,

9    which, you know, I think I was the one who articulated for the

10   Court what we wanted the Court to decide today, and I think

11   perhaps I did a poor job of doing it.  But this is how I see

12   it.  The Contingent deposited $8.8 million with the Court, and

13   we -- what we would like to do is if non-applicants don't have

14   a right to that 8.8 million, they might have the right to

15   nominal damages.  They might have a right to some other kind of

16   damages that I can't -- you know, that I don't really -- I

17   can't tell you one way or the other, but they don't have a

18   right to the $8.8 million that is sitting with the Court.  So

19   this is not a motion to dismiss.

20        The Dynamic Services plaintiffs can stay in this case even

21   if you decide they don't have a right to that 8.8 million

22   because maybe they have a right to something else down the road

23   that I don't know about.  But they don't have a right to the

24   8.8 million, and they don't have a right to that because it's

25   moot.  And you've had a lot of briefing on why it's moot.

1       And, you know, your -- your very first question to
2   plaintiff about can I really get rid of first-come,
3   first-served, is really -- you're hitting a nail on the head
4   with what we're talking about here today.
5       The case is moot.  The money is gone.  The fund is closed.
6   It's not taking new applications.  And so, you know, we cited
7   the *Outdoor Media Group* case, but there are a lot of cases that
8   where a program ends and the plaintiff is no longer subject to
9   a challenged policy, the claim for any prospective relief
10  becomes moot.  The prospective relief would be something like
11  reopen the fund; get rid of first-come, first-served, you know;
12  figure out how to do this a different way.  That would be
13  mandatory injunctive relief, but that is moot because there's
14  no money left.  There is no going back to this fund.
15      And what plaintiff has argued to you is, "Well, wait a
16  minute.  The 8.8 is sitting there.  Now we have to distribute
17  it on a non-racial basis."  But first the Court has to have a
18  justiciable issue between two parties that have something to
19  argue about to this Court, but none of the non-applicants can
20  argue to this Court that they have a right to that
21  $8.8 million, to those particular dollars, because that money
22  is already spoken for.
23      And when -- and when -- you know, plaintiffs have not
24  offered other specific possible solutions, and the reason is
25  because if they were to do so it would demonstrate why the

1    mandatory injunctive relief that they're seeking, or may be

2    seeking -- we don't really know -- but why mandatory injunctive

3    relief is impossible.

4         So the plaintiffs would have to request that the Court

5    order the plaintiffs to send some kind of court-approved notice

6    to anyone in Oregon that can demonstrate that they were able

7    and ready to apply when the fund was open and sending them a

8    notice saying now the fund is going to reopen.  I don't even

9    know and the plaintiff has not articulated how such a class

10   would be identifiable or manageable.

11        But let's say they can even accomplish that somehow.  Then

12   they're asking the Court to order the State to renew its

13   contract with The Contingent -- the contract that expired

14   December 30th -- order The Contingent to rehire its processing

15   staff that get laid off when the contract expires, order the

16   fund reopened, order The Contingent to accept new applications,

17   and then the Court would have to order The Contingent's black

18   hourly workers to process the applications of non-blacks and

19   award the money from the fund, which Mr. Sand already provided

20   evidence that he's afraid nobody would do that, and then the

21   Court would have to order that whatever awards they come up

22   with be allocated in some unknown but non-racial way that's

23   acceptable to the plaintiffs because the plaintiffs have

24   declared that first-come, first-served, which is clearly a

25   non-racial criteria, is suddenly now racial.

1          So this is not even, theoretically, possible relief that a

2     Court could order under the *Planned Parenthood* case that we

3     cited, in which the Court said a Court does not have the power

4     to decide the winner of or to establish the criteria for a

5     grant competition, at least not in these circumstances.

6          So what the plaintiff is really asking the Court to do is

7     to use some unarticulated criteria that pushes whites to the

8     front pro rata.  Today they mentioned lottery.  Either way,

9     they want to push whites to the front, which is not something

10    that the Court can order under *Planned Parenthood*.

11         So we --

12             THE COURT:  Although, is it really -- is it really

13    pushing whites to the front?  I mean, obviously, it's not just,

14    necessarily, whites; but, you know, Latinos could be -- you

15    know, indigenous people could also be part of those non-black

16    applicants, other people of color and businesses of color, but

17    it's not pushing them to the front, is it, really, if it's just

18    to now apply the rest based on the race-neutral -- and even if

19    it's applicants, then you've got hundreds -- 800 applicants in

20    the process who do not identify as black?

21             MS. GAMBLIN:  Very fair criticism.  I should say

22    "non-black" instead of "white."  That's fair.  For the purposes

23    of -- I mean, if we think about, in reality, what would happen

24    for people who have already applied, the people who applied

25    already, who don't identify as black, are going to have

1   applications, I assume, that go all the way throughout the

2   process.  You know, like Cocina Cultura applied in August,

3   right when the fund opened.  Presumably there are non-black

4   applicants all the way through the five months that the fund

5   was open.

6       And, frankly, if they -- you know, all of the black

7   applicants were processed, and that money was distributed.  So

8   the non-black applicants that are waiting there under the

9   first-come, first-served policy, frankly, if it were -- if this

10  fund were open to them, we would be front-loaded with non-black

11  applications; right?  So the -- whatever is left of the

12  8.8 million would really go probably to non-black people more

13  first.  And then as -- as the money was distributed, it would

14  become more mixed later.  There's not a practicality that's

15  how -- that's how first-come, first-served would be applied to

16  applicants.

17          THE COURT:  So I guess what I'm not understanding --

18  I'm not sure that this point makes a big difference in any

19  event, but it just goes to the first-come, first-served issue.

20  Again, I'm not -- if we don't know where the non-black

21  applicants are in the queue and then -- and, again, assuming --

22  assuming it even applies to -- not only to non-black

23  applicants, but I say, for the sake of argument, this was

24  improper racially conscious criteria that doesn't survive

25  strict scrutiny, if I were to rule that way, then wouldn't you

1    have to at least consider those other people in the queue and

2    maybe they applied first or maybe they didn't, even on the

3    first-come, first-served?

4            MS. GAMBLIN:  Right.  Yeah.  So I guess I'm trying to

5    demonstrate why first-come, first-served is not racial.  It's

6    because if you are in line first-come, first-served to

7    applicants and the non-black applications at this point are, as

8    a matter of practicality, going to be processed first

9    because -- is it making sense -- because all of the black

10   applicants have already been processed.

11           THE COURT:  I guess.  Oh, but you can tell when

12   everybody applied; right?

13           MS. GAMBLIN:  Right.

14           THE COURT:  So you're saying that those were just not

15   processed?

16           MS. GAMBLIN:  Right.

17           THE COURT:  Okay.

18           MS. GAMBLIN:  Since they are not processed and that

19   puts them back in the queue, then it would be front-loaded with

20   non-black applications.  And if we applied first-come,

21   first-served, the non-black applicants would get the first

22   distribution, so --

23           THE COURT:  But that's what I'm having trouble

24   seeing.  That -- because they applied earlier?

25           MS. GAMBLIN:  Yes.  Yes.  So let's say -- so let's

1    take a hypothetical non-black applicant that applied on

2    September 1st.  So if we were to reopen the fund and process

3    her application and they were all then put in the queue on

4    first-come, first-served, well, she was really early, and so

5    she would get one of the first distributions.

6        All of -- and any black applicants that applied in the

7    beginning of September, they were -- they have already been

8    processed, and they have gotten their award.  So they are not

9    even in the system anymore.

10           THE COURT:  I see.  So --

11           MS. GAMBLIN:  So a non-black --

12           THE COURT:  Now I understand.

13           MS. GAMBLIN:  Okay.  Okay.  All right.  So the

14   non-blacks are all over the queue.

15           THE COURT:  I just wasn't understanding why they were

16   front-loaded.

17           MS. GAMBLIN:  Right.  Yeah.  So the non-blacks, from

18   a date perspective, are all over the queue because that's

19   when -- they were processed according to when -- the date they

20   applied.

21           THE COURT:  Okay.

22           MS. GAMBLIN:  So it's --

23           THE COURT:  Go ahead.

24           MS. GAMBLIN:  No, that's okay.  You go ahead.

25           THE COURT:  All right.  No, that's -- what I wanted

1   to do just to -- if you had any more to say on that particular

2   issue or the issue about whether there's any issue -- say,

3   again, I even limited it to -- or if I ruled against you on

4   this issue, is there anything you wanted to add just on whether

5   the CARES Act or any of the authorizations prevented you

6   actually from giving out the money to anybody new or receiving

7   new applications, or is that -- that's what you've already

8   covered?  Is there anything more you wanted to say about that?

9            MS. GAMBLIN:  Yeah.  I mean, I think the whole -- the

10  mandatory injunctive relief that they appear to be seeking, it

11  just exemplifies why the law of mootness is the way it is and

12  why, you know, *Outdoor Media Group* says that when a program

13  ends, the plaintiff is no longer subject to the challenged

14  policy and the claim for prospective relief becomes moot, and

15  it's why the *Planned Parenthood* case says that, you know, a

16  court doesn't have the power to decide the winner.  The Court

17  can remove the racial criteria, but it can't do what the

18  Dynamic Service plaintiffs are asking it to do, which is to

19  form some unmanageable and unidentifiable class and -- and

20  order this reopening and new contracts to be engaged in and new

21  people to get hired and order those new people to do things

22  they don't want to do, and that is -- that is not relief that I

23  have seen any court opinion embrace.

24            THE COURT:  Okay.

25            MS. GAMBLIN:  I guess the one other point I want to

1   make, and then I will stand down, is that, you know, counsel

2   discussed doing it by lottery.  Let's just throw everybody in a

3   bucket and pick them out by lottery, or in prior briefing,

4   let's figure it out pro rata.  That creates just unbearable

5   conflicts between the class members.  It pits class members

6   against gets each other.  You know, some people will have to

7   take less in a pro rata scenario than they might be entitled

8   to, or if you throw it out by a lotto, those who applied, the

9   class members who actually filed an application are going to

10  be -- are going to get less or potentially get less or nothing

11  in a lotto, whereas now they're in line.

12      So I -- the class is wholly unmanageable, unidentifiable,

13  and -- and then the relief they're seeking is impossible.  It's

14  not possible for the Court to -- to issue and, therefore, the

15  non-applicants' claims for money from the fund that's sitting

16  with the Court is moot.

17          THE COURT:  So, Ms. Gamblin, on the -- you raised the

18  issue about class.  Isn't that more appropriately addressed in

19  a class certification process?  And maybe there is not a valid

20  class here.

21          MS. GAMBLIN:  I disagree only because this is an

22  issue of justiciability.  If there is no relief for a class,

23  for a potential class, or -- I mean, if there's -- if there's

24  no possibility of relief, the claim is moot.

25          THE COURT:  Okay.  All right.  Let me have -- go back

1   to Mr. Mitchell for a minute.  Just in the interest of managing

2   your time and mine, Mr. Mitchell, I'll allow you to argue

3   anything additional you would like to argue, but also if you

4   could just address some of the points raised now by both

5   Ms. Dove and Ms. Gamblin, and then I'll allow you to highlight

6   anything you wanted from your briefing.  And then I'll go back

7   to Ms. Dove to add anything you would like and Ms. Gamblin.

8        And if Ms. Mitchell [sic], for plaintiffs, or Ms. Hughes

9   want to weigh in, let me know at this time.

10       So Mr. Mitchell?

11            MR. MITCHELL:  Thank you, Your Honor.  There's a lot

12  to say, but I would like to begin, if I could, with a series of

13  questions that Your Honor was asking to Ms. Dove about the

14  point that there's no pending motion before this Court.

15  There's no request for a proposed order of any sort, and the

16  plaintiffs don't believe the Court has the ability to just rule

17  on an issue in the abstract that's not tied to some concrete

18  request for relief.

19       When we had our previous hearings during the month of

20  December, there was a pending motion from the plaintiffs for

21  preliminary injunction or temporary restraining order.  So

22  these types of issues that we're discussing today had relevance

23  because the plaintiffs were asking this Court for a preliminary

24  ruling on the merits of the case because that's one of the

25  components of the test to whether the plaintiff can get a

1    preliminary injunction.  All those issues have been taken off

2    the table because the defendants have placed the $8.8 million

3    in escrow.  And as we acknowledged in the last hearing, that

4    moots our request for preliminary relief because there's

5    nothing for the Court to enjoin once the Court has the money.

6        Now we're in a situation where there is no pending motion

7    before the Court.  No one is asking the Court for any type of

8    relief in the context of this case.  No one submitted a

9    proposed order to the Court.  Courts rule on motions and issue

10   orders.  They don't just rule on issues in the abstract.  And

11   with all respect to Your Honor, the plaintiffs don't see how

12   the Court can proceed further in the absence of some type of

13   motion or some type of request from one of the parties in this

14   case for some type of relief.

15       And, again, I think we had that when our preliminary

16   injunction motion was live, but it no longer is.  I know we all

17   worked very hard on these briefs.  Maybe we can use the

18   briefing that we've submitted to this Court in some future

19   motion if these issues come up again, and I'm sure they will

20   come up again; but Your Honor, I think, was making this point

21   in Your Honor's questions to Ms. Dove.  There has to be

22   something in front of this Court to rule on, and right now

23   there's nothing.  And all of these questions, in our view, are

24   premature.

25       If the defendants think our class certification -- I'm

1    sorry.  If they think our class definition is improper, then
2    that's something to be litigated when the plaintiffs move for
3    class certification, which we have not done.  If the defendants
4    think the case is moot, they should file a motion under
5    Rule 12(b)(1) to have the case dismissed as moot, or they
6    should file a motion to have a particular claim dismissed as
7    moot, and then we should have the opportunity to respond to
8    that, which we have not had yet.
9        I understand we submitted a brief that discussed mootness,
10   but it was not done in a context of a motion to dismiss
11   anything in this case as moot.
12       If the defendants think that people who didn't apply to
13   the fund do not have a claim for relief, they should file a
14   motion to dismiss Mr. Leja and Dynamic Services under
15   Rule 12(b)(6), and we should have an opportunity to oppose
16   that.  We just don't see how this current procedure is
17   consistent with how cases are supposed to proceed in federal
18   court.
19       A party should ask for relief from the Court in the form
20   of a motion.  The other party should have a chance to respond,
21   and the Court should rule, and there should be some proposed
22   order that we can respond to.  So I want to mention that point
23   first before, I think, addressing some of the more specific
24   issues that were raised by Ms. Dove and Ms. Gamblin.
25       Both Ms. Dove and Ms. Gamblin have said the case is moot

1   or the claims for prospective relief is moot because the

2   program has ended.   Clearly, the program has not ended.   The

3   court has the $8.8 million sitting in escrow, and that money

4   needs to be distributed some way.   And the Court needs to rule

5   on whether that money can be distributed with no strings

6   attached or, if the Court agrees with us, the Court has to rule

7   that the money needs to be distributed on a race-neutral basis,

8   but the Court has to rule one way or the other.   It's not moot

9   because the Court has the money.   And when the Court releases

10  the money, it will have to choose whether to release the money

11  with no strings attached or whether to release the money with

12  strings attached.

13      I understand the defendants believe that they should be

14  allowed to spend the money according to the way they want, but

15  that is a merits question.   It doesn't go to mootness.   And it

16  begs the question for them to say, "We've already decided how

17  this money should be distributed.   We should therefore be

18  allowed to distribute it that way."   Maybe they can win on that

19  argument, but that's a merits question.   They can't use that

20  argument to say that our case is moot or that our claims for

21  prospective relief are moot.

22      Ms. Gamblin is putting a lot of words in our mouth with

23  respect to our requested remedy.   We're not asking this Court

24  to dictate any particular method for distributing the funds.

25  We're not asking the Court to order the State defendants to

1    renew their contract with The Contingent.  They can find a

2    race-neutral way to distribute the money that may or may not

3    involve The Contingent.  We're not asking the Court to order

4    that The Contingent rehire people who were previously laid off.

5    The Court doesn't have to resolve any of that.  We're just

6    asking for a remedy from the Court that requires a race-neutral

7    distribution of the funds.  And the defendants can choose among

8    an infinite myriad number of ways that are race neutral and

9    constitutionally permissible for distributing the funds.  They

10   can choose to distribute them through The Contingent or not.

11   They can choose to do it by lottery or not.  They can choose

12   other types of methods.

13        So if Ms. Gamblin suggests we're asking the Court to get

14   into the weeds about how the money will be specifically

15   distributed, that's just wrong.  That's not our requested

16   remedy.  We're not asking for anything like that.

17        So, Your Honor, I'm happy to answer other questions, but I

18   think, with all respect, we don't think the Court should act at

19   this time just because there isn't a motion pending.  There

20   isn't a proposed order before the Court, and the types of

21   issues that we're discussing today should be litigated in the

22   context of either a motion for summary judgment, a motion to

23   dismiss under Rule 12(b)(1) or 12(b)(6), or a class

24   certification motion.  All of that will come later.

25        And I think, most importantly, the plaintiffs have a right

1   to take discovery before the Court issues rulings on the

2   merits.  And in no way do we think the Court can rule at this

3   point that the non-applicants have no claim for relief when

4   there hasn't even been discovery yet.

5       It almost sounds to me, from what I'm hearing from the

6   defendants, like a request for a premature ruling on summary

7   judgment when we have had no chance for discovery and no chance

8   to develop the factual record needed to show that we actually

9   have a claim.

10          THE COURT:  Okay.  Thank you, Mr. Mitchell.

11      Why don't I have -- Ms. Dove, did you want to respond

12  first for defendants?

13          MS. DOVE:  Yes, Your Honor.  Thank you.  Just a

14  couple of points.  First, you know, at the last hearing, this

15  Court ordered, with the agreement of all the parties, to brief

16  the issue as to whether those who failed to submit applications

17  before the fund closed have any claim for relief.  And while

18  that might not be titled a motion, that is what this Court

19  ordered briefing on and what all the Court -- all the parties

20  agreed to provide briefing on.  And to come back now, you know,

21  frankly, after seeking to postpone briefing on this, and say,

22  oh, but it's not a motion and we don't have a proposed order,

23  which is not required in this jurisdiction, in any event, I

24  think really elevates form over substance because the parties

25  have now briefed the issue that was ordered as to whether

1    non-applicants have a claim for relief, and that -- that does

2    go straight to the heart of whether non-applicants get to

3    sustain a claim.

4        So the fact that it wasn't titled under a 12(b)(6) or a

5    12(b)(1) motion, I don't think should override the fact that

6    these are the issues that were briefed for today, and everybody

7    was on full notice of them.  You know, notably, plaintiffs'

8    initial brief really only addressed the "able and ready"

9    standard and addressed the myriad of other issues in their

10   reply, but I don't think due process, in any sense, would be

11   offended if the Court ruled on the papers before it now because

12   this is the precise issue that we were ordered and agreed to

13   brief on this schedule.

14            THE COURT:  Let me jump in for --

15            MS. DOVE:  Sure.

16            THE COURT:  Ms. Dove, it was my recollection it was

17   actually the defendants' request that we deal with -- that I

18   make a ruling on that issue.  So it was actually defendants'

19   idea to brief the issue and tee up the legal argument on that

20   very issue.  So it wasn't something that the Court sua sponte

21   ordered.  It was at the request of defense.

22            MS. DOVE:  Sure.  And that's fair enough, Your Honor.

23   But if somebody had said at the time, "We really think this

24   would be more appropriately handled via a motion," I mean,

25   we -- we discussed a briefing schedule.  I don't think anybody

1    objected at the time and said, "This should be handled by a

2    motion and not briefing."  You know, I think motion practice

3    would look very similar to this.

4        So, you know, even if it was our request, which I in no

5    way disagree with, nobody -- nobody stood up and said, you

6    know, "No, this is inappropriate to be handled by a briefing

7    schedule rather than a motion," and I think that the issues

8    have been -- you know, have been vetted.

9        Then as to mootness, the State defendants really targeted

10    our briefing as to mootness to the non- -- the non-applicants,

11    which we do think the non-applicants cannot show a live

12    controversy without, as has been discussed, some of the

13    reopening and -- and everything that goes from there.

14        But, importantly, from the severability -- and I think our

15    position is consistent with The Contingent, but we come at the

16    discussion from a little bit of a different place, and that is

17    this cannot just be turned into a race-neutral program.  I

18    mean, we discussed this on our initial brief.  I believe from

19    page 13 to 14, where, you know, we had cases saying, you know,

20    you can't take the Indian out of the Indian Preferences Act.

21    You can't sever a piece of legislation where the part that

22    you're seeking to sever is so essentially and inseparably

23    connected with and dependent on the unconstitutional part, and

24    that's what is shown in the Oregon Emergency Board Members

25    declaration -- that we can't just take the black out of this --

1    out of this fund and redistribute it.

2        Now, we acknowledge -- we're not saying the Court has no

3    ability to offer any redress to current applicants, but it

4    can't do so -- and it's our position -- from severing the

5    race-conscious criteria and ordering the distribution of the

6    funds without that -- without that criteria.

7        It would have to take, in our view, some other -- some

8    other relief that would be more like just enjoining the whole

9    program, or something to that effect, and not redistributing

10   the funds in one of the myriad of ways Mr. Mitchell supposes

11   could be accomplished.

12       And that's all I had to say in rebuttal, unless Your Honor

13   has any other questions.

14           THE COURT:  Okay.  Let me just follow up on that

15   issue about what is feasible.  Couldn't you -- I understand

16   that there are reasons you don't want to, but if plaintiff is

17   right and it is an improper race-conscious criteria, then --

18   and it were applied just to applicants, you could turn it into

19   just a first-come, first-served, couldn't you?  Because you

20   could tell the date of everyone applying and if they were

21   otherwise eligible, they could -- you could do that; right?  I

22   mean, I understand some people don't want to do it, but that

23   could be done, couldn't it?

24           MS. DOVE:  Well, I guess there's a question, as a

25   practical matter, could that be done?  And then there's the

1    question of does that violate severability law, which, I think,

2    you know, given that today's focus really was non-applicants

3    and -- and to get to that question, we would sort of have to

4    cross a bridge of reopening the program somehow to

5    non-applicants, you know, we don't have, you know, a proposed

6    solution if -- you know, if this goes forward, just as to --

7    just as to current applicants, but we think that would actually

8    violate the severability because the race -- unlike some

9    programs that maybe have a set-aside, you know, like a

10   construction bid program that has a 10 percent set-aside for

11   minority-owned businesses, the -- this -- where you could just

12   enjoin that -- that set-aside part of the program and

13   construction bidding would then go on as usual and without the

14   10 percent set-aside, this entire fund was created for the

15   purpose of directing assistance to the black community.  And so

16   by removing the -- you know, so to speak, the Indian from the

17   Indian Preferences Act or the black from this fund, we think

18   that violates the severability and is impermissible.

19        So that is our legal response to that question, but it

20   doesn't cross the practical implications that Ms. Gamblin was

21   raising earlier.

22             THE COURT:  So let me ask you.  At the end of the

23   day, on the merits, if I were to find -- and, again, I'm

24   just -- we're not even close to being there, so I -- but for

25   the sake of argument, if the fund criteria were found to be --

1    not satisfy strict scrutiny analysis, what are you saying would

2    happen with the money?

3            MS. DOVE:  I honestly don't have a clear answer for

4    that question today, and I'm probably not the best person of

5    all the people present today to answer it.  I think for our

6    position, the -- just the more abstract answer is that it

7    can't -- it can't be distributed in a different way, and it

8    might -- the answer might be just the entire program gets

9    enjoined and perhaps the money gets sent back to the federal

10   government, and I don't -- I don't know the answer to that, so

11   I don't want to misspeak on exactly what would happen with the

12   money if it could not be alternatively distributed.

13           THE COURT:  That's fine.  And, again, I'm assuming,

14   for the sake of argument, that only applicants could get the

15   money.  If it were restricted to applicants, how would the

16   money be appropriately distributed for if it were determined

17   that the race-conscious criteria were unconstitutional?

18           MS. DOVE:  I don't think we have an answer to how --

19   because of our position on severability, how that could -- how

20   that could happen in a way that we would agree with.

21           THE COURT:  Okay.

22           MS. DOVE:  And I'm honestly not at all seeking to

23   dodge your question.  I think that's our position, and I don't

24   have a different one I could offer today.

25           THE COURT:  All right.  I appreciate that.

1          And, again, we're early in the process, so I understand.

2      Ms. Gamblin --

3              MS. POTTER:  Your Honor?

4              THE COURT:  Yeah.

5              MS. POTTER:  Your Honor, I'm so sorry.  This is

6  Sheila Potter for DOJ.  I just wanted to jump in to say, to be

7  clear, the answer -- and if we get to that stage in the case,

8  then, I think, certainly briefing from all the parties on

9  those -- the remedy will be important.  The answer will not be

10 that we give the money back to the federal government whatever

11 our position is.

12             THE COURT:  Okay.  Thank you.  All right.  I

13 appreciate that.  Thank you for the -- thank you for the

14 preview.

15     All right.  Ms. Gamblin, any additional issues you wanted

16 to raise and/or anything you wanted to say to supplement your

17 argument?

18             MS. GAMBLIN:  A couple of things, Your Honor.

19     First, I just want to point out Federal Civil Procedure 1,

20 which allows the Court to administer and employ the rules of

21 civil procedure in a way to secure the just, speedy, and

22 inexpensive determination of every action and proceeding.  And,

23 you know, in our hearing on December 17th, plaintiffs agreed to

24 this round of briefing and then agreed that they had the burden

25 of proof on this question.  And if the Court would like a

proposed order, we can file one this evening.

The question for the Court to rule on is an issue of justiciability, which is a threshold question that the Court must answer as we move this case forward. And the question, which -- as I see it more narrowly defined, the question is whether non-applicants have a justiciable claim from distribution from the fund. And the plaintiff is putting the cart before the horse. If the non-applicants have no Article III case of controversy, they cannot seek a non-racial distribution of the fund, which is currently deposited with the Court.

Now, first, the Court has to decide if there's even a case of controversy for non-applicants, and then they can move the rest of the case forward after that.

So counsel for plaintiffs also states that he doesn't want to dictate the way the money gets disseminated, but how can the Court order a reopening and processing and redistribution without dictating it? You know, plaintiffs have said that, you know, the non-racial first-come, first-served basis is indeed a race-based program itself. So if first-come, first-served is race-based, then it's on defendants to try to figure out some non-racial way to distribute and process applications. Does plaintiff just get to stand by and every time defendants come up with an idea say, "Oh, no, that's race-based. Oh, no, that's stated by race"? I mean, they have to offer a solution.

1    And the last thing I would like to say, and -- and I want

2    to say they haven't offered a workable solution because there

3    is none.

4    The last thing I want to say is the whole purpose of the

5    Court answering this threshold question now is because there

6    are hundreds of people in Oregon's black community who need

7    this money and who filed applications already.  There's

8    $8.8 million of the fund deposited with the Court, and if a

9    possible class in this case only consists of applicants, then

10   we can leave enough money with the Court to cover any potential

11   liability from all of those applicants.  So their rights will

12   all be protected by the money in the fund.

13   The $8.8 million is a lot more than the class of

14   applicants, and we would ask the Court, in a separate motion,

15   to give us the remaining money back and distribute it now to

16   Oregonians who need it now.  That's why we asked for this

17   expedited briefing, is to help people who need to pay rent now.

18   So the Court has the ability to -- to -- not only has the

19   ability, under Civil Rule of Procedure 1, to be entertaining

20   this question, but has the application to entertain this

21   permission as an issue of Article III justiciability, and

22   public policy interests are enormous for answering this

23   question now.

24        THE COURT:  And let me ask you if -- how much -- I

25   didn't see a calculation of damage of the fund that you want to

1   go back to the other folks who are waiting in the queue --

2   applicants -- if I were to rule in your favor.  So how much

3   have you determined should be held back and how much should be

4   distributed?

5           MS. GAMBLIN:  So, Your Honor, The Contingent was

6   really focused on processing applications up until

7   December 30th.  So I don't have a firm number for you.  I will

8   tell you that the class of applicants, if that were determined

9   the class, and they prevailed, a class of applicants has a

10  potential claim for somewhere between, we think, like, 2.5 and

11  3.5 million.  We think that is approximately the amount that

12  would be maintained with the Court, and we would ask for the

13  rest back.  We will be working -- you know, if you rule in our

14  favor on this question today, The Contingent and/or the State

15  will work tirelessly to get a firm number for you, and that

16  will be in our motion.

17          THE COURT:  Okay.  All right.  Anything further,

18  Ms. Gamblin, from you?

19          MS. GAMBLIN:  No.  Thank you, Your Honor.

20          THE COURT:  Okay.  Ms. Hughes, I said I would check

21  in with you.  Anything you wanted to add?

22          MS. HUGHES:  Not at this time, Your Honor.

23          THE COURT:  All right.  Thank you.

24      Then I'm going to go back to plaintiffs.  I know --

25  Ms. Scott, anything you wanted to add on behalf of Cocina?

1          MS. SCOTT:  Nothing at this time, Your Honor.

2          THE COURT:  All right.  And, Mr. Mitchell, I'll give

3    you the last word, since you do bear the burden.  Anything you

4    wanted to add in response?

5          MR. MITCHELL:  Your Honor, I think we have addressed

6    the mootness arguments sufficiently in our brief, but

7    Ms. Gamblin is conflating mootness and the merits.

8      If she's right to point out that non-applicants are not

9    entitled to relief from the fund, that goes to the merits.  It

10   does not defeat the existence in an Article III case or

11   controversy because, Your Honor, Your Honor has the money.  The

12   Court has the money, and the Court needs to decide how it will

13   be distributed one way or the other.  But however the Court

14   decides, it's a merits question.  It doesn't affect the

15   existence of a justiciable controversy, which is what

16   Ms. Gamblin suggested.

17     All of this is explained in our brief.  If Your Honor has

18   further questions, I would be happy to answer them.

19         THE COURT:  No.  Thank you.

20         MR. MITCHELL:  Thank you.

21         THE COURT:  So let me say when the issue was first

22   presented to me by Ms. Gamblin at our last hearing -- and

23   Ms. Dove, I think brought it up today -- that, you know, was --

24   probably nobody was really alerted to the complexity of this

25   issue, at least as presented.  So I did find that there are

1  many more issues entwined with the issue of whether relief is

2  limited to those who have applied or not, so I can tell you

3  that my inclination is that it is premature to determine that

4  issue based on how it's been teed up for the Court.

5      I am not sure what I -- I want to -- I'm essentially going

6  to reserve ruling on the issue.  I do want to look at it more

7  closely and consider some of the arguments that you've made

8  today, but I just wanted to let you know that my inclination is

9  it is too early and that there really may be factual issues

10  that affect standing and mootness and how that's going to

11  develop in the case and class, whether there's even standing

12  for the class both whether -- whether there is a class at all,

13  whether this is suitable for a class certification, whether

14  Mr. Leja and his company have standing at all, but I think that

15  there are factual issues that are tied up in that -- those

16  concepts.  So my -- again, my inclination is that it is

17  premature.  So I want to continue to move forward with the

18  case.

19      If upon further reflection of your briefing and the issues

20  that you have raised change my mind and it is something that I

21  think I can decide based on what I have been given, I will

22  certainly let you know and perhaps follow up with another

23  additional hearing.  But for now, I think it's -- we're still

24  at an early stage in the case, but I'm very mindful of the

25  importance of getting money freed up, and the -- and in a very

1    timely fashion.

2         So I have been trying to determine what -- from a case

3    management perspective, what seems to make the most sense in

4    terms of what happens next.

5         And let me ask from plaintiffs.  You mentioned you haven't

6    moved for class certification.  Ordinarily -- and can you tell

7    me what your intention is in that regard?

8              MR. MITCHELL:  So, Your Honor, we have mediation

9    scheduled for one week from today, on January 12th -- we're

10   going to see how that goes -- with Judge Mosman.  And then if

11   mediation fails to resolve the case, then we'll decide what to

12   do at that point with respect to class certification, but --

13             THE COURT:  Okay.

14             MR. MITCHELL:  We would need to take, I think, at

15   least some discovery before we move for class certification.

16   Maybe we can do it quickly through requests for admissions and

17   ask the defendants to respond quickly to those requests; but,

18   obviously, I think at any time a party moves for class

19   certification, you need some type of factual evidence on

20   numerosity that we would need to nail down.  So we would expect

21   to take at least some time on discovery before we could move.

22             THE COURT:  So let me do this, and then I'll hear

23   from both the State and The Contingent and The Black Fund, as

24   well, whether this makes sense.  I think we have the class

25   certification issues.  We have issues of standing, merits, and

expedited discovery.  There was -- I think defendants wanted a

briefing on post hoc evidence, also, and its admissibility,

which I do want to address that issue.  My thought is to order

that -- all the sides here -- and that includes Cocina -- come

up with a -- confer and come up with a briefing schedule that

includes and -- and that is an expedited class certification,

if that is where we're headed, and merits hearing and discovery

schedule.

    I did want you to present a jointly, agreed-on hopefully,

schedule to me after your meeting with Judge Mosman for your

attempt at settlement, but I thought by January 22nd if you

could provide a joint proposed schedule of what happens nexts.

And, again, I'll -- I really would like to expedite all aspects

of this case so that we can release the funds as quickly as

possible to those in need.

    Let me ask plaintiff.  Mr. Mitchell, does that make sense

to you?  I think Judge Mosman is meeting with you all on the

14th.

            MR. MITCHELL:  Is it the 14th?  Mr. Benbrook can

correct me.

            MR. BENBROOK:  I think it's the 12th.

            THE COURT:  The 12th.

            MR. MITCHELL:  Yes.  From the plaintiffs' standpoint,

we should have no problem preparing an agreed schedule with the

defendants by the date Your Honor suggests.

1          THE COURT:  Why don't I do this:  Can you do it by

2     the 19th?  That's a week.

3          MR. MITCHELL:  That should work as well.

4          THE COURT:  Okay.  So let's -- so plaintiffs are fine

5     with a conferral and briefing schedule, and that will allow you

6     to sort out what is going to need to be briefed by the 19th.

7       Let me ask Ms. Dove.  Is that acceptable to the State?

8          MR. DAVIDSON:  This is Mr. Davidson again.  I'll

9     field this one.  That's acceptable to the State defendants.

10    Thank you, Your Honor.

11         THE COURT:  Okay.  And, Ms. Gamblin, what about you?

12         MR. ALDRICH:  Your Honor, this is Mr. Aldrich on

13    behalf of The Contingent.  We were actually hoping for a

14    process that would move more quickly than that.  We do have

15    mediation set for next week, but a class is a threshold issue

16    on many related aspects of this case; and, frankly, we were

17    hoping to get class certification briefing underway by that

18    date, not -- we see no reason to have a date by which the

19    parties will meet and confer to establish a date upon which

20    class certification briefing will commence.

21      Your Honor previously mentioned wanting to get class

22    certification completely out of the way in the month of

23    February.  If plaintiffs' opening brief could be served on the

24    19th, then we can have an expedited process to get to a hearing

25    by the middle of February and resolve whether or not there is a

1  class.

2      Frankly, Your Honor, if there's no class that involves

3  non-applicants, that is another way to get to where we were

4  trying to go today, which is if there's no class involving

5  non-applicants, then money should get distributed to applicants

6  who are currently in line.  So the faster we can get to that

7  answer, the faster we can get money doled out to people who are

8  waiting.

9      So our request would be to have opening brief by the 19th,

10  and then move forward quickly from there to a class

11  certification hearing.

12          THE COURT:  Well, the only -- I only put the

13  conferral after Judge Mosman meets with you because

14  Mr. Mitchell may be evaluating, based on what Judge Mosman has

15  to say, whether this is a suitable case for a class.

16      So that's why I was -- now, how about this:  We can make

17  it even --

18          MR. BENBROOK:  Your Honor, sorry to jump in.  This is

19  Mr. Benbrook.

20          THE COURT:  Yeah.

21          MR. BENBROOK:  To say that briefing should be done

22  two weeks from today, that completely eliminates and

23  short-circuits the opportunity for discovery, which Your Honor

24  just noted one of the items to confer on, and it's entirely

25  customary that there would be some discovery before a class

1    cert motion is filed.  So, you know, a briefing schedule in two

2    weeks on a class certification motion is completely

3    unrealistic, given -- given those things.

4              THE COURT:  All right.  I agree.  How about is there

5    any reason that the conferral, at least as to a briefing

6    schedule, can't be done by the 15th?  Or you can do it earlier.

7    I mean, I'm happy to have the conferral -- I just want you

8    all -- instead of me just managing how you're going to do this

9    and how quickly you're going to do it, which I'm willing to do

10   if you can't agree, but I want any expedited discovery on an

11   expedited basis.  I want any class certification on an

12   expedited basis, and I want the merits to be on an expedited

13   basis.

14        So it seemed, to me, you sitting down and conferring on

15   what needs to be done, but -- but I'm not sure plaintiffs will

16   know what needs to be done until they -- the settlement

17   conference.  So at least that's why I thought it would behoove

18   everyone to engage in some kind of settlement.

19        How about this:  How about we have -- Mr. Mitchell, can

20   you get the schedule done by the 15th, just to shorten it a

21   little bit?

22              MR. MITCHELL:  I think so, Your Honor.  If mediation

23   fails, then we have every incentive to move quickly, and we'll

24   want to move quickly, just as defendants do.  So I believe we

25   can get a proposed schedule on -- again, we would need some

1    time for discovery for class certification, but we will work

2    that out with the defendants and get a proposed schedule to

3    Your Honor by the 15th.

4              THE COURT:  Okay.  So let me go back to the

5    defendants.

6         So any reason, from the State defendants, Ms. Dove, the

7    15th as the -- January 15, 2021, you will have conferred and

8    come up with a briefing schedule and for various aspects of the

9    case.

10             MR. DAVIDSON:  This is Mr. Davidson.  Yes, that's

11   fine, Your Honor.  Thank you.

12             THE COURT:  And, Ms. Gamblin, does the 15th work --

13   or Mr. Aldrich?

14             MR. ALDRICH:  Yes, Your Honor, the 15th works.

15        And I would also throw in that to the extent discovery is

16   needed for class certification, I would invite that discovery

17   to get served as soon as possible.  There is no reason to wait

18   until the 15th for them to serve discovery that they think

19   would be necessary for the class certification process, and

20   that way that briefing can get engaged as quickly as possible

21   after the 15th.

22             THE COURT:  Okay.  I appreciate that.  And anything,

23   Ms. Hughes?  For the 15th, are you able to participate in that,

24   or any problem with the 15th as a date by which you all give me

25   what your proposed schedule is?

1    MS. HUGHES:  No problem with the 15th.

2    THE COURT:  Okay.  Thank you.  And let me ask -- go

3  back to Cocina.  Ms. Scott, I didn't want to leave you out.

4  Does the 15th work for you as well?

5    MS. SCOTT:  The 15th is fine with us, Your Honor.

6    THE COURT:  Okay.  So with -- so that will be the

7  schedule.  I want you all to meet and confer and come up with a

8  briefing schedule that deals with expedited everything.  And,

9  again, if there's any issues that you need me to assist in, I

10  mean, I hope you can resolve this without me, but I'm happy to

11  get engaged if there's -- if necessary.

12    With respect to the question -- I think it was from you,

13  Ms. Gamblin, but I'm not positive -- I think it was all

14  defendants on the issue of post-enactment evidence.  Again --

15    MR. DAVIDSON:  Your Honor, that was actually the

16  State defendants' request.

17    THE COURT:  Okay.  Got it.  Got it.  Mr. Davidson, do

18  you -- I'm fine if people think that makes sense to have

19  special briefing on that issue.  I understand it's a time and

20  money save -- cost-saving measure.  Having looked at some of

21  the cases, both *Coral Construction* and *United States v.*

22  *Virginia*, there's -- depending on what the evidence is of the

23  initial enactment, there may be -- it may be admissible to get

24  some of the post-enactment information.  So I really can't say,

25  based on this record, is kind of how I come out on that.

1    So it may or may not be admissible, depending on what the

2   picture in this case looks like.  But I'm happy to have you all

3   brief it if, as part of your conferral, you think it makes

4   sense to do so.

5    You know, I don't want people to go to any extra time or

6   money if it's not going to be fruitful.

7    So does that answer your question enough, Mr. Davidson?

8        MR. DAVIDSON:  I think, in light of the conferral

9   timeline that the Court has set in other respects, I think that

10  that would be fine, and we frankly are not entirely clear of

11  plaintiffs' position on this, anyway, so an extra opportunity

12  to confer about it would be helpful.

13       THE COURT:  Okay.  Perfect.  All right.

14   So that's all I had, at least on my list, to cover today.

15    Mr. Mitchell, anything that you need me to add or address

16  or clarify?

17       MR. MITCHELL:  Nothing further, Your Honor, unless

18  Mr. Benbrook has something that I missed.

19       THE COURT:  Mr. Benbrook?

20       MR. BENBROOK:  No.  Just to confirm the discovery

21  schedule we're talking about is discovery not just on -- just

22  on class certification but for the case, as well, since you are

23  also -- for the merits, since we're also talking about setting

24  a briefing schedule for the merits.  I just want to make sure

25  that there's no ambiguity on that point.

1        THE COURT:  Correct.  Because I think that the merits

2  are also -- should be resolved on an expedited schedule.

3        MR. BENBROOK:  Right.  For example, there's various

4  assertions about how much money is spoken for, the numbers of

5  people and so forth, that needs to be confirmed in an open

6  process that we -- we receive that information.

7        THE COURT:  All right.  I don't want to wade into

8  what is discoverable and what is not, but I do expect discovery

9  on both class certification and the merits.

10      All right.  So, otherwise, Ms. Scott, anything you wanted

11  to add on behalf of Cocina?

12        MS. SCOTT:  Nothing further right now, Your Honor.

13        THE COURT:  All right.  And then for defendants,

14  Ms. Dove or Mr. Davidson, anything you wanted to add today or

15  that I need to clarify?

16        MR. DAVIDSON:  No.  Thank you, Your Honor.

17        THE COURT:  Ms. Dove?

18        MS. DOVE:  No.  Thank you, Your Honor.

19        THE COURT:  All right.  Ms. Gamblin?

20        MS. GAMBLIN:  No.  Thank you, Your Honor.

21        THE COURT:  All right.  Mr. Aldrich?

22        MR. ALDRICH:  No.  Thank you, Your Honor.

23        THE COURT:  And Ms. Hughes?

24        MS. HUGHES:  No.  Thank you.

25        THE COURT:  Thank you, everybody, for both your

1   briefing and your arguments, and we --

2            MR. BUCHAL:  Your Honor?

3            THE COURT:  Yes.

4            MR. BUCHAL:  This is James Buchal.  I did have one

5   item for the Court.  These abstract discussions have been very

6   fascinating and the counsel have all throughly ventilated the

7   issues, but the general rule is only one attorney is allowed to

8   talk for a side, and as local counsel, I was hoping I could

9   adequately vindicate my obligation to meaningfully participate

10  by working on the pleadings with them.  And so I was going to

11  ask you for leave to be excused from future hearings.

12           THE COURT:  That's fine, as long as they understand

13  all the rules, and you make sure of that.

14           MR. BUCHAL:  I'm working on it, Your Honor.  Thank

15  you.

16           THE COURT:  Okay.  Thank you, Mr. Buchal.

17       All right.  Well, it sounds like I have heard from

18  everybody.  So thank you, everybody, and we'll be in recess.

19                    (Hearing concluded.)

20

21

22

23

24

25

1                       C E R T I F I C A T E

2        Great Northern Resources, Inc. v. Katy Coba, et al.
                            3:20-cv-01866-IM
3        Cocina Cultura LLC et al v. State of Oregon et al.
                            3:20-cv-02022-IM
4                         Telephonic Hearing

5                          January 5, 2021

6            I certify, by signing below, that the foregoing is a true

7    and correct transcript, to the best of my ability, of the video

8    conference proceedings heard via videoconference, taken by

9    stenographic means.  Due to the audio-visual connection,

10   parties appearing via speakerphone or cell phone or wearing

11   masks due to coronavirus, speakers overlapping when speaking,

12   speakers not identifying themselves before they speak, fast

13   speakers, the speaker's failure to enunciate, background noises

14   and/or other technical difficulties that occur during video

15   conference proceedings, this certification is limited by the

16   above-mentioned reasons and any technological difficulties of

17   such proceedings occurring over the video conference at the

18   United States District Court of Oregon in the above-entitled

19   cause.

20           A transcript without an original signature, conformed

21   signature, or digitally signed signature is not certified.

22

23   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
24
     Official Court Reporter        Signature Date: 1/13/2021
25   Oregon CSR No. 98-0346         CSR Expiration Date:  9/30/2023